AUDREY SHANLEY *vs.* ANN H. MILETTA.

JUNE 14, 1961.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

Powers, J. This is an action of trespass vi et armis brought to recover damages for injuries resulting from a bullet wound allegedly inflicted by the defendant. The case was tried before a superior court justice sitting with a jury and resulted in a verdict for the plaintiff. It is before us on the defendant's bill of exceptions to the denial of her motion for a new trial and that the verdict as returned is excessive. All other exceptions have been expressly waived by the defendant.

It appears from the record that on the evening of March 13, 1959, plaintiff, while in the company of Viola Johnston, met defendant in a Providence cafe. The three women were known to each other in varying degrees but it appears that relations between plaintiff and defendant were hostile, the defendant apparently having attempted to assault plaintiff with a knife the previous week.

After the cafe was closed for the night, plaintiff and her companion went to the lot where the latter's car was parked, but were temporarily unable to move it because of prevailing icy conditions. They were joined by defendant and the testimony is conflicting as to whether plaintiff was first pushed into defendant's car by its owner or became a pas-

senger voluntarily. In any event plaintiff admits that on the suggestion of her companion she later became a voluntary passenger in defendant's car, which left the parking lot with defendant as operator.

Miss Johnston testified that she, accompanied by a waitress from the cafe, followed defendant's car for about five minutes when, because of defendant's erratic driving, she drew abreast and persuaded defendant to stop; that she induced defendant to follow her to the Governor Dyer restaurant for coffee; and that defendant followed for a while but was suddenly no longer behind her. Although Miss Johnston substantially corroborates plaintiff's testimony as to the events which transpired up to the time that the cars became separated, she had no knowledge of what happened thereafter.

The plaintiff and defendant agreed that they drove around for something more than an hour, but their testimony is sharply conflicting as to what happened during that time. The plaintiff testified that defendant was abusive and violent, struck her repeatedly without provocation and threatened to kill her, but admitted that at no time did she see a gun.

The defendant denied that she had pushed plaintiff into the car and insisted that plaintiff had been the aggressor. She denied that she had been drinking, but plaintiff's testimony to the contrary was corroborated by Miss Johnston.

The plaintiff's version of the aggravated assault is that she suddenly felt a sharp pain in her leg and defendant asked, "Now, how do you like that!" but plaintiff qualified the quotation somewhat by adding, "or something." She further testified that she then asked, "Was that a real bullet?" and defendant responded, "Yes, it is a real bullet." "If you go to the police or tell anybody I shot you I'll make it bad and tough for you." The plaintiff added that her knee was very painful and was bleeding.

In testifying further, plaintiff stated that although she could barely walk she got out of the car and within seconds was met by an officer in a police car who directed her to the nearest telephone. When asked if she had informed the officer that she had been shot she replied, "No, sir, I did not. I was too ashamed." It appears from plaintiff's testimony that she called a friend who picked her up and took her, not to the plaintiff's home, but to her own. The plaintiff further testified that although she felt sick she waited until later in the morning to call her doctor, following which she went to the Miriam Hospital.

It is defendant's testimony that plaintiff left her car without injury and got into a taxi. She denied seeing any police cruiser and attributed all violence and threats to plaintiff. She emphatically denied ever possessing a gun, or aiming or pointing one at plaintiff.

In any event, plaintiff was admitted to the Miriam Hospital on the morning of March 14 suffering from a bullet wound which had caused a comminuted fracture of the right patella. X rays revealed that a bullet was lodged in her right knee and surgery was necessary to remove it. The plaintiff remained in the hospital for three weeks, during which time her right leg was in a long cast and was constantly causing her great pain. At the time she was discharged she required crutches and testified that it was necessary to use them for the next three months. Thereafter for a period of two months she walked with a cane on the advice of her doctor. At the time of the trial, some eighteen months after her discharge from the hospital, she still suffered pain in her leg, walked with a limp and faced a long period of therapeutic treatment, according to her testimony.

The plaintiff's exhibits reveal that she incurred a hospital bill of $507.85, and that just prior to the trial her injury had resulted in a doctor's bill of $280. In addition to these

expenses, plaintiff testified that at the time of the assault she was employed at the Emma Pendleton Bradley Hospital in East Providence where she earned $214 a month plus $20 monthly for maintenance; that she was unable to work at all for fourteen months by reason of her injury; and that, since her employer had been unable to hold her position open, when at last she was able to work she had to accept employment at a considerable loss of income. It would appear that the total out-of-pocket losses resulting from the injury to her knee amounted to some $4,700.

It is further apparent from the record that defendant was charged with a criminal offense as a result of the altercation with plaintiff, but the exact offense is not made known. Captain Thomas B. Healey of the Providence police department took charge of the investigation when plaintiff's injury was reported shortly after she entered the Miriam Hospital. He testified that early in the evening of March 14 defendant was taken to the hospital and she and plaintiff identified each other.

He further testified that while defendant was at the hospital she insisted on going to the women's lavatory, which she was permitted to do. Shortly after defendant's visit, apparently on instructions from Captain Healey, a nurse entered the lavatory and discovered a woman's cloth handbag which had been left in the trash can. This bag contained a woman's compact, cigarette lighter, wrist watch, and a revolver with four undischarged and one discharged cartridge. The captain testified that plaintiff identified the articles with the exception of the pistol and cartridges as belonging to her, but denied bringing them to the hospital with her. Captain Healey also testified that he confronted defendant with the handbag and the articles it contained and that, although she denied placing the bag in the trash can, she did identify the articles as the property of plaintiff, including the gun which defendant claimed to have taken from plaintiff.

Detective William Pasquale, who assisted Captain Healey in the investigation, testified that defendant, while denying ownership of the articles, did admit that they were in her bag.

Both police officers testified that there were stains on the right-hand side of the mat on the floor of the front seat, but were unable to identify the nature of the stains. It appears that the mat had been sent to the laboratory at the University of Rhode Island for an analysis of the stains but if an analysis had been made the result was not made part of the record.

The trial justice instructed the jury that if they established defendant's guilt they would then consider damages, and that in addition to out-of-pocket expenses, damages for pain and suffering and for permanent injuries, they could assess punitive damages. He then gave them further instructions as to the nature of such damages. The jury returned a verdict for plaintiff in the sum of $12,500.

The defendant argues that the verdict was excessive and has referred to our attention several decisions of this court in which it was found that the damages were in fact excessive. None of these cases, however, is of any assistance since in none of them was the plaintiff entitled to punitive damages. The jury in the instant case did not expressly indicate in their verdict that punitive damages were included, but it is reasonable to assume that they were. In the circumstances of the case the jury, in determining liability, found that defendant had shot plaintiff, and following the instructions of the trial justice it is unlikely that they would have failed to assess some penalty in addition to those damages which would be proper in a suit for negligence.

The plaintiff stresses that the award in excess of actual damages is $7,800 and argues that since this amount covers future expenses, possible permanent residuals, pain and suffering and punitive damages, the verdict was not exces-

sive by any reasonable computation. On the other hand, defendant contends there is strong indication that the jury acted arbitrarily in arriving at the sum of $12,500 since that figure is precisely one half of the ad damnum prayed for by the plaintiff.

While the relation made between the two figures is true, that it exists as a result of more than coincidence is no less a matter of speculation, in this case, than it would be for us to declare that it were other than coincidence. In our opinion, whenever the amount of damages arrived at by a jury can be supported by a reasonable hypothesis based on the evidence and instructions received by the jury, such amount should not be disturbed if it is otherwise not excessive. This is especially true where, as here, damages incapable of accurate measurement are involved. See *Hargraves* v. *Ballou*, 47 R. I. 186.

In the case at bar it must be borne in mind that better than one third of the amount arrived at is represented by the actual out-of-pocket damages suffered by plaintiff; that the injury was found to have been inflicted deliberately and was in its nature permanently injurious; and that a part of the total sum represents punitive damages, a consideration which could understandably increase the figure ultimately to be awarded. We are persuaded that in view of the several elements of damages which the jury could properly take into consideration the verdict as returned is not excessive.

The defendant argues in support of her remaining exception that the trial justice, in passing on the motion for a new trial, failed to exercise his independent judgment in reviewing the evidence, the weight thereof and the credibility of the witnesses, reached his conclusion on speculation and failed to specify his reasons as required. Although not in complete agreement we recognize that the decision of the trial justice in denying her motion is somewhat sketchy, and have therefore carefully reviewed the testi-

mony of the several witnesses, weighed the evidence together with the inferences which might properly be drawn therefrom, and conclude that the weight of the evidence does not preponderate against the verdict nor fail to do justice between the parties.

The defendant's exceptions are overruled, and the case is remitted to the superior court for entry of judgment on the verdict.

*William R. Goldberg, Ronald R. Gagnon,* for plaintiff.

*James H. Kiernan, John H. DiStefano,* for defendant.